ESPARZA v HORN MACHINERY COMPANY

Docket No. 85514. Submitted November 19, 1986, at Detroit. Decided
    March 25, 1987. Leave to appeal denied, 428 Mich —.

Ismael Esparza was injured in 1978 during the course of his
    employment at Metal Specialties while operating a power press
    which Metal Specialties had purchased used in 1966 from
    Metro Industries, Inc., with Horn Machinery Company acting
    as the broker for the sale. Esparza and his wife brought a
    products liability action in Wayne Circuit Court against Horn
    Machinery Company, alleging negligence and breach of implied
    warranty on the basis of a lack of proper safety equipment at
    the time of the 1966 sale. Horn Machinery Company brought a
    third-party action against Metro Industries, Inc. At trial, Horn
    Machinery claimed and offered proof to show that it was not
    negligent at the time of the 1966 sale, that it had breached no
    implied warranty of fitness and that liability, if any, lay with
    Esparza's employer, Metal Specialties. At the close of proofs,
    Horn Machinery moved for a directed verdict. The trial court,
    David P. Kerwin, J., denied the motion. The trial court in-
    structed the jury on an employer's statutory duty to provide a
    safe workplace, an employer's duty under OSHA regulations to
    provide and insure use of point-of-operations guards on a press
    and an employer's duty to instruct its employees on the safe
    operation of a power press. The court further instructed that, if
    the jury found a violation of the statute or regulations by the
    employer, it could find that the employer was negligent and
    that it could then determine whether that negligence was a
    proximate cause of plaintiff's injury. The jury found that Horn
    Machinery was not negligent and had not breached an implied
    warranty. Plaintiffs appealed, alleging error on the basis of the
    instructions relating to the employer's liability. Horn Machin-
    ery cross-appealed.

The Court of Appeals held:

REFERENCES

Am Jur 2d, Negligence § 192 et seq.

Am Jur 2d, Products Liability § 266 et seq.

Am Jur 2d, Trial § 726.

See the annotations in the Index to Annotations under Products
    Liability.

1. A defendant may properly argue and present evidence that liability lies with an unavailable party. Accordingly, it was proper for Horn Machinery to proceed on the theory that liability lay with plaintiff Ismael Esparza's employer.

2. The instructions as given properly set forth Horn Machinery's theory of the case.

3. In any event, since the instructions at issue go to proximate cause and the jury found that Horn Machinery was not negligent, error, if any, in those instructions was harmless.

Affirmed.

NEGLIGENCE — PARTIES — EVIDENCE — JURY INSTRUCTIONS.

A defendant in a negligence case may properly present evidence and argue that liability for the accident lies with a person who is not a party to the action; upon proof tending to establish liability in someone other than the parties to the action, the defendant is entitled to proper instructions to the jury incorporating its defense that liability lies with another.

*Small, Clark & Berris, P.C.* (by *Marvin L. Berris*), for plaintiffs.

*Joselyn, Rowe, Grinnan, Hayes & Feldman, P.C.* (by *William A. Joselyn*), for defendant.

Before: SHEPHERD, P.J., and WAHLS and SULLIVAN, JJ.

PER CURIAM. Ismael Esparza (hereinafter plaintiff) was injured while operating a mechanical power press at work. Plaintiff and his wife sued defendant, the seller or broker of the machine, alleging negligence and breach of implied warranty. Plaintiff's wife claimed loss of consortium. The jury found that defendant was not negligent and breached no implied warranty. On appeal, plaintiff and his wife claim that the jury was erroneously instructed. Defendant cross-appeals from the trial court's denial of its motion for directed verdict. We affirm.

The basic facts are undisputed. Plaintiff was

employed by Metal Specialties. Defendant was in the business of buying and selling used machinery. At the request of Metal Specialties in 1966, defendant purchased a used Niagara Master Serial A inclinable press from Metro Industries for Metal Specialties as a broker, charging a twelve percent fee. Metal Specialties inspected the press at Metro Industries' premises and picked it up from there. Defendant never took possession. According to Frank Horn, defendant's owner, defendant's practice was to sell such machinery "as is" when the customer intended to make its own repairs, which he believed Metal Specialties intended to do.

It appears that the press was used to stamp out or form metal parts using a variety of dies. The operation of the press involved a ram which descended to a heavy bolster plate mounted on the bed of the press. The point of operation in such a press is the area between the dies mounted on the ram and bolster plate. When no dies or tooling parts were mounted in between the ram and bolster plate, the closest possible distance between them was twenty-two inches. When purchased in 1966, the press had no point-of-operation guards, such as barriers to prevent insertion of an operator's hand into the die space, or point-of-operation devices, such as presence-sensing mechanisms or dual palm buttons requiring the operator to use both hands to operate the press, to name but a few of the possible protections. In 1966, the press was activated by a foot pedal mounted four to five inches off the floor in the front.

Following federal OSHA standards enacted in 1970 and a suggestion by its insurance carrier, plaintiff's employer substantially modified the press to comply with regulations. The modifications included the addition of barrier guards. The foot pedal was replaced by an electric foot switch

and dual palm buttons. The operator could select between the modes of operation. When the palm buttons were selected, it would be impossible for the operator's hand to enter the point of operation when the ram came down, as both hands would be on the buttons. When the foot switch was selected, the operator's hands would no longer have to be on the buttons for the press to work. The foot switch would therefore leave the operator's hands free to enter the point of operation.

Plaintiff's accident occurred two or three weeks after he started working for Metal Specialties. He began working on a press operated with dual palm buttons. On November 1, 1978, plaintiff was assigned to the press in question. His accident occurred about one minute after he started operating it.

Plaintiff's foreman demonstrated the operation. Each piece of stock had to be fit into the press by hand, pushing it in a bit further for each component to be stamped out. It was not necessary, however, for the operator's hands to enter the point of operation. Because hand feeding was required, the operator could not use the dual palm buttons to cycle the press, as the piece of metal stock would then fall out of the die space. Therefore, plaintiff had to use the foot switch.

The hairpin guard on the press was apparently adjusted too high on the operator's side, allowing plaintiff's hand to enter the point of operation. Stamped-out pieces were not automatically ejected. The parts would come out the front and fall into a basket. About one minute after he started to work the press, a part became stuck and plaintiff tried to get it out by hitting it with a piece of steel. His hand slipped through the wide opening on the right side into the die space, while his foot, which was on the switch, caused the press to cycle,

resulting in the ram coming down and inflicting extensive injury to his hand.

Plaintiff and his wife brought suit against the defendant and others. With regard to defendant, plaintiff asserted that defendant acquired ownership of the press and sold it to plaintiff's employer in a defective and unsafe condition and that a suitable point-of-operation guard or device was not incorporated at the time of sale. Specifically, plaintiffs claimed that the press should have been equipped with dual palm buttons or that the palm buttons should have been electrically interlocked with the foot switch so that the foot switch could not be operated without simultaneously depressing the palm buttons. At trial, plaintiff readily conceded the negligence of plaintiff's employer as being a cause of plaintiff's injuries. With regard to plaintiff's employer, however, worker's compensation was plaintiff's exclusive remedy.

Considerable testimony was taken concerning applicable safety standards. There was one industry standard, but no governmental standards, which plaintiffs alleged to be applicable to such presses in 1966. This industry standard was the United States Standard Association 1960 B 11.1 standard, sponsored by the National Safety Council. It provided that each press must be equipped and operated with a point-of-operation guard or device for each operation performed, except where the point of operation was limited to a one-quarter inch opening.

Other standards followed. The 1971 American National Safety Institute (ANSI) standard similarly allowed the use of either a guard or device, but did not apply when the point of operation opening was one-quarter inch or less. This standard was a voluntary industry standard applicable in 1978 when plaintiff was injured. The federal govern-

ment promulgated the OSHA standards in the early 1970's. Michigan did the same thing with the MIOSHA standards, which in this particular case became effective on April 30, 1976.

Thus, in 1978, when the accident occurred, ANSI, OSHA and MIOSHA had similar standards relating to press guarding. They placed the burden of the point-of-operation protection on the employer. The 1960 B 11.1S standard, however, did not address who should be responsible for the installation of the appropriate point-of-operation protection. Plaintiffs' expert, Dr. Nagler, concluded that the standard only applied to the seller of the equipment. Defendant's expert, Dr. Uzgaris, testified that the 1982 ANSI standard, although implemented after the accident, nevertheless clarified the intent of all the standards from 1922 on as intending to place the obligation for safeguarding the point of operation on the user or employer.

Each party's expert came to a different conclusion as to whether defendant was negligent when the press was sold in 1966. Plaintiff's expert, Dr. Nagler, thought that the press should have been provided with dual palm buttons in 1966 by the broker or seller. Alternatively, Dr. Nagler believed that if a foot mechanism was to be included as an actuating device it should have been electrically coordinated with the palm buttons so that the foot pedal could not cycle the press unless the operator simultaneously depressed the palm buttons, an effective system interlock. Dr. Nagler concluded that, absent these safety features, the press was defective in 1966 when it was purchased by Metal Specialties. It was also Dr. Nagler's opinion that it was necessary for plaintiff's employer to attempt to change the press in 1970-1971, because no devices were on the press at the time it was sold which would occupy the operator's hands, such as

the palm buttons would have done. Dr. Nagler testified that the press was defective at the time defendant sold it and that the defect, the failure to have incorporated a point-of-operation device in the press at the time of sale, was a proximate cause of plaintiff's injuries. Dr. Nagler said that the employer would have had to make changes on the press after purchasing it from defendant in order to make it safe. The changes made by plaintiff's employer, however, were made in a negligent manner. Dr. Nagler therefore identified two causes of the accident: defendant's conduct in selling the press and the employer's negligence.

Defendant's expert, Dr. Uzgaris, testified that the press, when purchased in 1966, should be considered as a component of a press "system." The system was not complete until other components, such as the tooling of dies and a method of feeding or injection, had been incorporated. Once the system was completed, the particular operation selected, the dimensions of the stock being used determined, and the means of activation decided, then, and only then, could the user or employer choose the most effective means of protecting the point of operation. Without dies and stock metal in the press, the minimum distance between the ram and bolster plate was twenty-two inches, a space not hazardous to the operator. Because this press, without tooling as a component, did not present a hazard to the operator when purchased, Dr. Uzgaris concluded that it was not defective without a point-of-operation guard or device in 1966.

The trial court denied defendant's motion for a directed verdict at the close of defendant's proofs. The jury found that defendant was not negligent and had breached no implied warranty of fitness. The trial court accordingly entered a judgment of

no cause of action against plaintiffs. The trial court subsequently denied plaintiffs' motion for a new trial.

Plaintiffs' sole issue on appeal concerns the inclusion of three jury instructions requested by defendant. Instruction number nine was an instruction on the employer's statutory duty, MCL 408.1011; MSA 17.50(11), to furnish a place of employment free from recognized hazards causing or likely to cause death or serious bodily injury. Instruction number ten was an instruction on the employer's duty pursuant to OSHA regulations to provide and insure the usage of point-of-operation guards or devices on every operation performed on such a press. Instruction number eleven was an instruction on the employer's duty pursuant to general industry safety regulations to train and instruct operators in the press' safe operation and determine by adequate supervision that correct procedures are followed, that safeguards are installed and used, and that the point-of-operation guards are applied and adjusted on all press operations. The instructions also stated that, if the jury found the statute or regulations violated, they could consider such as evidence that the employer was negligent and then determine whether such negligence was a proximate cause of plaintiff's injury.

These instructions were taken from SJI2d 12.01 and 12.05. Plaintiffs do not dispute that the statute and regulations were in existence and applicable to plaintiff's employer at the time of plaintiff's accident. Instead, plaintiffs argue that the effect was to apply those instructions in a situation which was beyond the intended scope of the instructions, emphasizing the employer's conduct without also adequately instructing that there may be more than one proximate cause of the

injury. Plaintiffs argue that the jury's attention was unfairly drawn to the employer and away from defendant. Plaintiffs also argue that SJI2d 12.01 and 12.05 apply only to a plaintiff's or a defendant's conduct, not that of a third party such as an employer. Finally, plaintiffs argue that SJI2d 15.05, dealing with the intervening negligence or conduct of a person not a party, was adequate to instruct the jury that it could consider the employer's negligence and decide that no liability existed because the employer's actions were the sole proximate cause of the accident.

Jury instructions must be reviewed as a whole and not in selected excerpts to determine if error has occurred. *Eide v Kelsey-Hayes Co,* 154 Mich App 142, 150; 397 NW2d 532 (1986).

It is perfectly proper for a defendant in a negligence case to present evidence and argue that liability for an accident lies elsewhere, even on a nonparty. *Love v Brumley,* 30 Mich App 61, 63; 186 NW2d 19 (1971). See also *Kujawski v Cohen,* 83 Mich App 239, 242-243; 268 NW2d 358 (1978). Plaintiffs have conceded the employer's negligence and that it was a proximate cause. It was not unfair for defendant to seek to blame someone else for the accident when plaintiffs sued defendant.

Although SJI2d 12.01 and 12.05 are phrased in terms of the negligence of a plaintiff and defendant, we do not believe it was improper to adapt them to the context of a third party's negligence. In this case, plaintiff's employer could not be sued because plaintiff's exclusive remedy against his employer was under the worker's compensation act. The unavailability of plaintiff's employer as a party, however, should not preclude evidence and arguments on the employer's negligence as an intervening cause, for example.

Reviewing the instructions as a whole, defendant's requested instructions adequately stated the law and were applicable, as plaintiff's employer's negligence was clearly at issue. The instructions concerned duties in effect at the time of plaintiff's accident. The instructions were simply adapted from the standard jury instructions to fit the circumstances of this case, as no standard instructions sufficed. The jury was also adequately instructed that more than one proximate cause was possible, that the claimed negligence of defendant need not be the only cause nor the last cause, and that, if they found defendant to be negligent and that negligence to be a proximate cause of the accident, it was not a defense that the employer and plaintiff might also have been negligent unless the jury found that only the employer's conduct was a proximate cause. This latter instruction was the substance of SJI2d 15.05, which plaintiffs argue should have been given. The instructions as a whole did not unfairly distract the jury from the issue of defendant's negligence. We thus find no instructional error. It is clear that the importance of the requested instructions on the employer's negligence related to the determination of proximate cause. By finding defendant not negligent, however, the jury never reached the proximate cause issue. Thus, even if the instructions were erroneous, any error was harmless.

Our disposition makes it unnecessary to reach defendant's cross-appeal on the directed verdict issue.

Affirmed.